UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH KATHRYN STEPHENS,

     Plaintiff,

v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA AND KELLY
SERVICES, INC. DISABILITY INCOME
PLAN,

     Defendants.

Case No.  No. 14-11809
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION
REQUESTING JUDGMENT ON THE ADMINISTRATIVE RECORD AND
DENYING DEFENDANTS' MOTION FOR JUDGMENT AFFIRMING THE DENIAL
OF PLAINTIFF'S REQUEST FOR BENEFITS**

---

Plaintiff Elizabeth Stephens brings this suit pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. From late 2012 to at least mid-2013, Stephens, a Benefits Coordinator for Kelly Services, Inc., suffered from heart problems and high blood pressure and could not work. Although Defendants Prudential Insurance Company of America and Kelly Services, Inc. Disability Income Plan provided short term disability benefits for a time, Stephens says that Defendants terminated those benefits too early and wrongly denied her long term disability benefits.

Before the Court are Plaintiff's Motion for Judgment on the Administrative Record (Dkt. 26) and Defendants' Motion for Judgment Affirming the Denial of Plaintiff's Request for Benefits (Dkt. 29). Upon careful review of the briefs and the Administrative Record, for the following reasons, the Court REMANDS to the plan administrator for further administrative proceedings.

## I.

### A.

Kelly Services, Inc. employed Stephens as a Benefits Coordinator starting on November 8, 2010. (Dkts. 13–15, Administrative Record ("AR") at 184.) Kelly Services covered Stephens under its Disability Income Plan ("the Plan"). (Dkt. 24, at 1–36.) Coverage included short term disability ("STD") and long term disability ("LTD"). (AR at 183.) Defendant Prudential administers claims under the Plan. (Dkt. 24, at 33.) Kelly Services, Inc.'s Benefit Plans Committee was the Plan administrator. (*Id*.)

The Plan provides benefits to employees with a "certified disability," which the Plan defines as follows:

> "Certified disability" means you are under the care of a Physician. You will not be deemed to be under the care of a Physician on any day more than 31 days before the date he or she has seen and treated you in person for the disease or injury that caused the disability, and the Claims Administrator has determined there is a significant change in your physical or mental condition while you are covered under the Disability Plan that will effect the following:
>
> During your first 36 months of disability, you are not able, solely because of sickness or injury, to perform the substantial and material duties of your own occupation, and you have a 20% or more loss in earnings due to the same sickness or injury.
>
> After 36 months of disability, you are not able, solely because of sickness or injury, to perform the substantial and material duties of any occupation for which you are reasonably suited through education, experience, or training.

(Dkt. 24, at 12.)

### B.

After about two years at Kelly Services, Stephens underwent cardiac surgery—an aortic Type A dissection repair—at the University of Michigan Hospital. (AR at 325.) She was hospitalized from November 19, 2012 until December 7, 2012. (AR at 325.) After her release,

2

she was briefly re-hospitalized at Saint Joseph Mercy Hospital in Oakland County on December 8, 2012 because of "severe palpitations." (AR at 674.)

Stephens submitted a claim to Prudential for STD benefits on December 11, 2012. (AR at 795–800.) Prudential approved Stephens for STD coverage from November 19, 2012 through June 30, 2013. (AR at 729, 823.)

Records from Stephens' hospitalization noted that her "post-operative course has been complicated by an acute chronic kidney injury." (AR at 328.) Dr. Fahd Al-Saghir, Stephens' long-time nephrologist, evaluated Stephens on January 9, 2013 and reported that her chronic kidney disease was at stage three. (AR at 224, 282.) According to Dr. Al-Saghir, her kidney disease had been "stable for years." (AR at 282.)

On January 16, 2013, Dr. Bo Yang, the cardiac surgeon who treated Stephens at the University of Michigan Hospital, wrote that Stephens had "recovered well" from her November 2012 operation. (AR at 336.) Still, Dr. Yang noted various complications, including edema, chronic renal insufficiency, and high blood pressure. (AR at 336.) He recommended a follow-up with Dr. Kirit Patel, a cardiologist. (AR at 336–37.) Prior records reflect that high blood pressure was an issue for Stephens leading up to her November 2012 surgery. (*See*, *e.g.*, AR 211.)

Dr. Patel examined Stephens on January 31, 2013. He concluded, "Overall from the cardiac standpoint, patient is stable." (AR at 675.) But he prescribed Xanax because Stephens had "a lot of anxiety." (AR at 675.) Stephens also visited Dr. Al-Saghir that day. (*See* AR at 225.) Dr. Al-Saghir noted, "Acute kidney injury with recent hospitalization with dissecting thoracic aneurysm, resolved." (AR at 225.) He again noted that Stephens' chronic kidney disease was at stage three. (*Id.*)

3

From February 20, 2013 through April 22, 2013, Stephens attended 24 cardiac rehabilitation sessions at St. Joseph Mercy Hospital in Oakland County. (AR at 310–313.) According to her discharge report, Stephens experienced "[o]ccasional episodes of minor shortness of breath with initial exercise session with symptoms lessening as [she] progressed in [the] program." (AR at 310.) Her "average exercise/MET level" improved throughout the program. (AR at 310.) The report also stated that Stephens would "continue with a home based exercise program" involving walking. (AR at 310.)

In connection with her receipt of STD benefits, Stephens filled out a detailed daily activities questionnaire for Prudential on March 17, 2013. (AR at 314–21.) She listed various conditions that would prevent her from returning to work: aortic dissection surgery, depression, hypertension, glomerulonephritis, arthritis, asthma, a voice box injury, and numbness in her fingers and left hand. (AR at 314.) She reported that her voice "goes out," making it difficult to speak over the phone at length. (*Id.*) Similarly, she stated that it would be difficult to sit in front of a computer at length because of chest pain. She also wrote that she needed to "keep stress levels low" and that she could not do household activities involving pushing, lifting, or stretching because of pain from her incisions. (AR at 314, 318.) She reported that she walked for four hours and read for two each week. (AR at 319.)

Several days later, on March 20, 2013, Stephens again visited Dr. Al-Saghir. He noted that Stephens' chronic kidney disease and edema had become "unstable." (AR at 230.) His notes also indicated "Lethargy/Dry mouth." (AR at 230.)

On April 16, 2013, Stephens followed up with Dr. Yang at the University of Michigan Hospital. According to a report from the examination, Stephens stated that "her recovery is steadily progressing." (AR at 651.) The report concluded, "In summary, Mrs. Stephens remains

4

stable. . . . She was advised to not excessively strain, lift, push, or pull more than 30 – maximum 50 pounds." (AR at 652.)  In a letter to Drs. Patel and Al-Saghir about the examination, Dr. Yang wrote, "Mr. Stephens did not like Mrs. Stephens going back to work. We will extend her time off work for another three months since the stress at her work was very high and her blood pressure was consistently high during the work." (AR at 654.)

Two days later, on April 18, 2013, Dr. Al-Saghir reported that Stephens had high blood pressure and that her chronic kidney disease was still at stage three.  (AR 105–07.)

By May 9, 2013, Dr. Patel, Stephens' cardiologist, wrote, "I think clinically she seems to be doing fine" following her surgery at the University of Michigan. (AR at 666.)  And he thought that her hypertension was "well controlled" and that her glomerulonephritis and renal insufficiency were "stable now." But he also wrote that Stephens "is very, very confused after the surgery.  Since it is not getting better and is getting worse, which is very contrary to her previous nature, we will at least get a CT or an MRI of the brain."

On May 22, 2013, Dr. Al-Saghir signed a form for Prudential, which, consistent with the April 16, 2013 report from Dr. Yang, marked July 16, 2013 as a target date for Stephens' return to work. (AR at 669.) He also wrote, "Can do desk work . . . Can't do lifting or physical work." (AR at 670.)  He also appears to have written (his handwriting is difficult to decipher), "Monitor BP and kidney function." (AR at 670.) Dr. Al-Saghir's notes from a visit with Stephens that day reflect that she walked for a half-hour daily. But he noted that Stephens did not "feel good," suffered from "memory loss/loss of focus," and that her incision was "hurting." (AR at 241.)

Some evidence in the record suggests that in June 2013, Stephens' recovery became more complicated. During that time, she made several visits to the emergency room at Saint Joseph Mercy Hospital Oakland. First, on June 5, 2013, Stephens went to the hospital, reporting heart

palpitations. Records from the visit reflect that on that same day "her palpitations have now improved and she has no more symptoms now." (AR at 562.) Another physician noted the next day that Stephens "stated that she walks on a daily basis, approximately 1.25 miles per day without difficulty" and that prior to the heart palpitations, she had "walked earlier that day without experiencing any of the aforementioned symptoms." (AR at 568.) The hospital discharged Stephens on June 6, 2013.

Stephens was again hospitalized because of reported heart palpitations from June 8–12, 2013. (AR at 530, 535.) Tests revealed high blood pressure, which was ultimately controlled, and a focal dissection of the anterior abdominal aorta. (AR 535.) She was instructed to follow-up with Dr. Al-Saghir in five to seven days and Dr. Patel in two weeks. (AR at 531.)

Stephens again went to the hospital two days after her prior discharge, because of elevated blood pressure and palpitations. (AR 543.)

After her release from her third hospitalization in about two weeks, Stephens followed up with Dr. Al-Saghir on June 19, 2013. According to his notes, Stephens' kidney disease had elevated from stage three to four. (AR at 244, 246.) He also noted in a letter to Dr. Patel, "Episodes of hypertensive urgencies, questionable panic attacks." (AR at 244.)

Stephens followed up with Dr. Patel on June 20, 2013. He described her condition as "stable" but noted her "significant anxiety" and stress. (AR at 649.) He also wrote, "I think she is probably not ready to go to work basically because of her anxiety, the uncontrolled hypertension, the residual dissection of the descending thoracic aorta, and the repair of the ascending aorta in November 2012. In my opinion, the lady should probably just stay off work and be disabled."

On June 23, 2013, Stephens went to the emergency room again and reported that her heart was racing. (AR at 556-57.) On arrival, her blood pressure and heart rate were "normal."

6

Three days later, Stephens returned to Dr. Al-Saghir. That day Dr. Al-Saghir wrote to Dr. Patel: "She reports an erratic pulse associated with blood pressure spikes," but "[h]er heart is regular rate and rhythm." (AR at 254.) Dr. Al-Saghir also wrote, "Worsening renal function" and "Recent spikes in heart rate and blood pressure. Etiology is not clear." (AR at 254.) A holter test from that day yielded these results: "Rare atrial or ventricular actopic beats were present. A single 6-beat nonsustained atrial run occurred." (AR at 146.)

On July 26, 2013, Stephens sent another daily activities questionnaire to Prudential. She reported that she walked 30 minutes daily and read two hours weekly. (AR at 390.) She also reported memory loss and difficulty pushing, pulling, and lifting. (AR at 388–89.)

On July 31, 2013, Dr. Al-Saghir wrote a letter describing Stephens' various conditions, including stage four chronic kidney disease "secondary to chronic membranous glomerulonephritis," labile hypertension that is "difficult to control," and type two diabetes. He concluded, "I feel that Elizabeth Stephens needs to stay off of work and is not able to go back to work because of labile hypertension that is difficult to control and fluctuation in her kidney function." (AR at 152.)

With the foregoing medical evidence in hand, in early August 2013 Prudential decided that Stephens had not been disabled under the Plan as of July 1, 2013 and therefore terminated her STD benefits. On August 12, before receiving formal notice of this decision, Stephens called Prudential to file an application for LTD benefits. (AR at 789.) On August 13, 2013, Prudential informed Stephens by letter that it had terminated her STD benefits as of June 30, 2013. (AR at 820–23.) Later, on January 22, 2014, Kelly Services communicated to Stephens that she was not eligible for LTD benefits because her certified disability from November 19, 2012 through June 30, 2013 did not meet the Plan's twelve-month elimination period. (AR at 183.)

## C.

Stephens would eventually appeal these decisions but continued with medical treatment in the meantime.

On September 5, 2013, Dr. Patel noted that Stephens "had significant problems with anxiety disorder . . . with multiple admissions, but now she has settled down." (AR at 147.) He concluded that "[f]rom an aortic aneurysm dissection standpoint, she is fine." (AR at 147.)

Three weeks later, Dr. Al-Saghir wrote that Stephens had "[a]cute kidney injury on top of [stage four] chronic kidney disease." (AR at 132.) Still, he stated that her blood pressure was "well-controlled now." (*Id.*) He also wrote, "[c]ongestive heart failure, compensated." (*Id.*)

On December 10, 2013, Dr. Yang wrote a letter noting that he had last seen Stephens on April 16, 2013. (AR at 308.) Even so, he opined on Stephens' ability to work: "I feel that she is stable from a cardiac stand point and would not disable her. I feel that any decision on her disability should be made by the physicians currently treating her on a regular basis. The important issue is to control her systolic blood pressure and our cardiologist will help her with the blood pressure control." (AR at 308.)

On January 20, 2014, Dr. Al-Saghir wrote another letter describing Stephens' medical history and current status. (AR at 282.) Dr. Al-Saghir noted that her chronic kidney disease "deteriorated" after her November 2012 surgery. (AR at 282.) He also wrote, "She continues to report surges of her blood pressure in the evening. Blood pressure control is important to protect her kidneys from further deterioration in her renal function. Also, the fact that she has chronic kidney disease makes her blood pressure more resistant to treatment." (AR at 282.) He wrote that the stresses of daily life "lead to surges in her hypertension, to the best we can see it, and that would make her even sedentary job stressful to the way she describes it." (AR at 283.)  Thus, Dr.

8

Al-Saghir concluded, "It is my feeling, because of the difficulty in controlling Mrs. Stephens' hypertension and the anxiety that she had developed after her thoracic surgery, Mrs. Stephens is disabled from performing the material and substantial duties of her regular occupation as a Benefits Coordinator for Kelly Services." (AR at 283.)

On February 4, 2014, Dr. Robert Brook from the University of Michigan's Hypertension and Vascular Medicine Clinic examined Stephens and found that her hypertension was under control. In a letter to Dr. Al-Saghir, Dr. Brook wrote, "In sum, I believe her blood pressure is extremely well controlled at this point in time. In the past, I believe that she was paying too much attention to inaccurate home blood pressure readings as well as some spurious and intermittent and episodic blood pressure elevations." (AR at 48.) He also noted that based on his review of her home blood pressure log, "[h]er average blood pressure now is likely over controlled still." (AR at 50.) He noted that her Type A dissection "is stable" and that "prior poor control hypertension reported by patient was spurious." (AR at 50.) As for physical restrictions, he advised Stephens that she could walk for 30 minutes per day at three to three and a half miles per hour and should "follow the limitations of the weightlifting as prescribed by the thoracic surgeons." (AR at 52.) Finally, he noted that her kidney disease appeared stable. (AR at 52.)

## D.

On January 24, 2014, Stephens appealed Prudential's August 2013 termination of her STD benefits. (AR at 164–267.)

In connection with Stephens' appeal, Prudential retained an occupational health specialist, Dr. Joseph Rea, to review Stephens' entire medical record. In an April 4, 2014 report, Dr. Rea found "insufficient support for any significant physical limitations from July 1, 2013, forward." (AR at 157–163.) He acknowledged that her "central medical issue" was hypertension,

which "probably both contributed to and resulted from advance[d] kidney disease" and "likely had a role in aortic dissection." (AR at 160.) But he cited Dr. Brooks' February 2014 finding that Stephens' hypertension was controlled, if not over controlled. (AR at 160.) Dr. Rea also concluded that Stephens' physicians' comments that Stephens was "disabled" were "probably overconservative in view of the evidence." (AR at 162.) Dr. Rea also pointed to Dr. Yang's December 2013 letter and the results of a February 4, 2014 echocardiogram as evidence that Stephens' general cardiac health was stable. (AR at 43–44, 160.)

On April 30, 2014, Prudential denied Stephens' appeal for STD benefits in a letter that borrowed heavily from Dr. Rea's report, finding "Based on the information available, there appeared to be insufficient support for any significant physical limitations from July 1, 2013 forward." (AR at 802–05.) In a separate letter, Prudential denied Stephens' appeal for LTD benefits. (AR at 806–809.)

## E.

Stephens filed suit against Defendants on May 6, 2014. She asserts that Defendants terminated her STD benefits and denied her LTD benefits in violation of the Employee Retirement Income Security Act of 1974. (Compl. at ¶¶ 6, 34.) Defendants disagree, asserting that Prudential's decision was neither arbitrary nor capricious. (Dkt. 29, Def.'s Mot. for J. at 24.) On January 20, 2015, the parties filed summary-judgment motions in support of their positions. (Dkt. 29, Def.'s Mot. for J.; Dkt. 26, Pl.'s Mot. for J.)

## II.

Section 502(a)(1)(B) of ERISA authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the

plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

## A.

A plan administrator's decision to deny benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the [plan's] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When the plan grants the plan administrator such discretion, then a court must review the administrator's denial of benefits under the arbitrary-and-capricious standard." *Shaw v. AT & T Umbrella Ben. Plan No. 1*, — F.3d —, No. 14-2224, 2015 WL 4548232, at *7 (6th Cir. July 29, 2015) (citing *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 456 (6th Cir.2003)).

Here, the Plan provided Prudential "full discretion" over the administration and interpretation of the Plan, determinations of benefits eligibility, and determinations of the statuses and rights of Plan participants. (Dkt. 26, at 31.) Accordingly, the parties agree that the arbitrary and capricious standard of review applies. (Dkt. 29, Def.'s Mot. for J. at 13–14; Dkt. 26, Pl.'s Mot. for J. at 1–2.)

## B.

"The arbitrary or capricious standard [of review] is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir.1989) (internal quotation marks and citations omitted). Yet, arbitrary and capricious review "is not . . . without some teeth." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (internal quotation marks and citations

omitted). Indeed, a district court reviewing a plan administrator's determination under the arbitrary-and-capricious standard does not sit merely to "rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Evans*, 434 F.3d at 876 (quoting *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

On review, this Court considers only the evidence before the plan administrator at the time the employee's disability eligibility was determined. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

## III.

Defendants argue that Prudential's April 30, 2014 letter, which is the decision under review, see *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1066 (6th Cir. 2014), "presents a principled reasoning process based on the available information and is supported by that information." (Dkt. 29, Def.'s Mot. for J. at 19.) The Court disagrees. Timing proves fatal to any conclusion that Prudential's April 30, 2014 denial letter was the product of a "deliberate, principled reasoning process supported by substantial evidence." See *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 394 (6th Cir. 2009).

## A.

Though Prudential determined that Stephens was no longer disabled as of the *first of* July, 2013, the record—including the views of Stephens' three treating physicians—demonstrates that Stephens was not able to return to work at the very least through the *fifteenth* of that month.

12

Consider first Dr. Yang's April 16, 2013 assessment of Stephens. Dr. Yang, Stephens' cardiac surgeon at the University of Michigan Hospital, noted that Stephens was "making very good progress on recovering," but he determined that it was necessary for her to remain off work for three more months. (AR at 654.) His reason was that "the stress at her work was very high and her blood pressure was consistently high during the work." (AR at 654.) By December 10, 2013, months after Prudential denied Stephens' STD benefits, Dr. Yang changed course, writing, "I feel that she is stable from a cardiac stand point and would not disable her." (AR at 308.) Nevertheless, Dr. Yang noted that he had not personally seen Stephens in close to eight months, and he expressly deferred any ultimate disability determination to her other physicians: "I feel that any decision on her disability should be made by the physicians currently treating her on a regular basis." And at the time of Dr. Yang's December 10, 2013 letter, the two physicians to whom he deferred—Dr. Patel and Dr. Al-Saghir—both held the view that Stephens was disabled.

Stephens' cardiologist, Dr. Patel, asserted on June 20, 2013 that Stephens was "probably not ready to go to work" and that she "should probably just stay off work and be disabled." (AR at 649.) He cited a host of reasons for Stephens' disability: "anxiety, the uncontrolled hypertension, the residual dissection of the descending thoracic aorta, the repair of the ascending aorta in Nov. 2012." (AR at 649.) True, in his September 2013 letter, Dr. Patel did not opine on Stephens' disability status, and he described her condition as "stable." (AR at 147.) But there is little room to interpret his "stable" remark as indicating that he thought Stephens was able to work—he made the very same comment in his June 2013 letter in which he suggested she should remain off work indefinitely. (AR at 649.) In other words, Dr. Patel never expressly backpedaled from his conclusion that Stephens was disabled.

13

Dr. Al-Saghir also believed that Stephens was disabled at all times relevant to her claim for benefits. According to a May 22, 2013 questionnaire that he submitted to Prudential, he recommended for her to remain off work at least through mid-July 2013. (AR at 669.) By the end of July 2013, Dr. Al-Saghir, opined, "I feel that Elizabeth Stephens needs to stay off of work and is not able to go back to work." (AR at 152.) He cited Stephens' hypertension "that is difficult to control" and "fluctuation in her kidney function." (AR at 152.) Into early 2014 he still thought that Stephens could not return to work, emphasizing Stephens' hypertension, kidney disease, and anxiety. (AR at 282.)

In sum, all three of Stephens' treating physicians thought that she should remain off work at least through July 15, 2013—two weeks after Prudential terminated Stephens' benefits.

**B.**

To be sure, Prudential was not required to defer without question to Stephens' three treating physicians. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician."). However, Prudential was not allowed to "arbitrarily disregard" them either. *See Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006); *see also Black & Decker*, 538 U.S. at 834 ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). As evidenced by Prudential's April 30, 2014 denial letter, Prudential did just that in concluding that Stephens was not disabled as of July 1, 2013.

In its denial letter, Prudential informed Stephens that her "own cardiologist, Dr. Yang, opined they did not find [her] to be disabled from a cardiac perspective." (AR at 804.) But Dr. Yang in fact recommended for Stephens to remain disabled "for another three months" starting

14

on April 16, 2013. (AR at 654.) His December 2013 letter eliminates any ambiguity concerning when that three month period ended, as he noted that he had previously "extended her disability to mid July 2013." (AR at 308.)

Prudential's denial letter also minimized Stephens' physicians' disability determinations because "later commentary showed Ms. Stephens's cardiac status was overall stable." (AR at 804.) Prudential's statement reveals its own flaw: the "later commentary" about Stephens' health status was from September 2013, December 2013, January 2014, and February 2014, and did not speak to her health status in July 2013.

Indeed, the denial letter highlights Prudential's erroneous reliance on post-July 2013 medical evidence. Prudential claimed that Stephens' hypertension "of late, seemed to have been placed under better control, if not even excessive control" and cited Dr. Brook's February 4, 2014 letter in support. (AR at 803.) But Dr. Brook indicated only that Stephens' hypertension was under control "at this point in time," *i.e.*, as of the writing of his February 4, 2014 letter. (AR at 48.) Dr. Brook did not comment on the status of Stephens' blood pressure as far back as July 1, 2013. (*See id.*) Nor did his letter opine on Stephens' overall disability status. (*See id.*)

Similarly, Prudential's letter asserts that Stephens' kidney disease was "managed supportively through medication and nutritional supplementation." (AR at 804.)  Yet, Prudential failed to acknowledge that Stephens' kidney disease—though stable by the time of the April 2014 letter—had become unstable immediately prior to the termination of her benefits. Indeed, Dr. Al-Saghir diagnosed Stephens with stage four kidney disease in late June 2013 and concluded in July 2013 that she was disabled as a result of that and other issues. (AR at 152, 244, 246.)

15

Prudential's letter also placed undue reliance on Dr. Rea's April 4, 2014 file review of Stephens' records.

First, though nothing is "inherently improper with relying on a file review," the Sixth Circuit has held that "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295, 297 n. 6 (6th Cir. 2005). Here, the Plan gave Prudential the right to "schedule an independent medical exam" at any time during its review of Stephens' claim. (Dkt. 26, at 16.) The Plan also provided that if Prudential and a treating physician "cannot agree on a length of disability, there may be an independent medical examination arranged." (Dkt. 26, at 16.) Prudential scheduled no such examination.

Second, Dr. Rea's findings themselves are questionable. He reached the conclusion that "there appeared to be insufficient support for any significant physical limitations from July 1, 2013 forward" by erroneously calling into question the credibility of Stephens' treating physicians. In particular, Dr. Rea claimed, "There has been comment that Ms. Stephens is 'disabled' from working. However, this stance is probably overconservative in view of the medical evidence." (AR at 162.) As discussed, this opinion, insofar as it applies to Stephens' condition in July 2013, is simply not supported by the record. Dr. Rea also implicitly challenged Stephens' credibility, citing Dr. Brook's statement that "[t]he report of poor control of hypertension as seen by Ms. Stephens was judged to be 'spurious,' given measurements at the clinic screening visit were actually low." (AR at 160.) Dr. Rea's "credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary." *See Helfman*, 573 F.3d at 395–96.

16

Third, because much of Prudential's April 30, 2014 denial letter appears to have been copied directly from Dr. Rea's report, it is no surprise that the letter and report share the same overarching flaw: Dr. Rea arbitrarily used medical evidence from *well after* July 1, 2013 in an attempt to establish that Stephens was no longer disabled *as of* July 1, 2013. In text that ultimately appeared verbatim in Prudential's denial letter, Dr. Rea cited Dr. Yang's December 2013 letter to conclude that Stephens' overall cardiac health was stable; Dr. Rea cited Dr. Brook's February 2014 letter to conclude that her hypertension was under control; and Dr. Rea cited a February 2014 Echocardiogram, noting that Stephens' "[h]eart function was overall normal." (AR at 160, 803.) None of this evidence from late 2013 and early 2014 supported the overall findings of Prudential and Dr. Rea that "there appears to be insufficient support for any significant physical limitations from July 1, 2013 forward." (AR at 160, 803.)

Thus, the reasons Prudential provided in its April 30, 2014 letter terminating Stephens' benefits as of July 1, 2013 simply do not support rejecting the consistent opinions of three treating sources that Stephens was disabled past that date.

## C.

Defendants now attempt to shore up Prudential's decision by criticizing Stephens' treating physicians' references to anxiety and stress, asserting, "The lack of the required diagnosis by a treating physician who specializes in psychological disorders precludes any reliance on Stephens' claimed anxiety to support her claim of disability." (Dkt. 31, Def.'s Resp. to Pl.'s Mot. for J. at 4.) The Court is not persuaded by Defendants' post-hoc rationale.

The Sixth Circuit has acknowledged that "stress may be a factor in individuals with heart conditions that may prevent them from working." *Helfman*, 573 F.3d at 395. In *Helfman*, the Court held that a plan administrator's failure to consider plaintiff's stress weighed in favor of an

arbitrary and capricious finding because nothing in the plan "precluded 'prophylactic' restrictions and limitations on [plaintiff's] ability to work from consideration." *Id.*; *see also Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 673 (6th Cir. 2006) (holding that it was "unreasonable for Metlife to have dismissed stress as an improperly documented, subjective, and irrelevant factor in its disability determination").

As the Defendants point out, the Plan here provides, "If you are on disability due to a mental/nervous diagnosis, the Disability Plan requires you to have a treating physician who specializes in psychological disorders." (Dkt. 26, at 16.) However, this does not render Stephens' reported anxiety and stress totally irrelevant to her claim. Similar to the plan in *Helfman*, nothing in the Plan here appears to prohibit consideration of prophylactic restrictions and limitations in determining whether a Plan participant is disabled. Additionally, the record makes clear that each of Stephens' three treating physicians cited anxiety as only one of several factors preventing her from working. For instance, Dr. Al-Saghir's January 20, 2014 letter references Stephens' anxiety as a contributor to her hypertension, which in turn influences (and is influenced by) her kidney disease. (AR at 283.)

Defendants rely on *Hogan v. Life Ins. Co. of North America*, 521 F. App'x. 410 (6th Cir. 2013), to discount Stephens' treating physicians' references to her anxiety and stress. In *Hogan*, the Court held that the plan administrator did not arbitrarily or capriciously deny Hogan's benefits claim that was based heavily on mental health issues undiagnosed by a specialist. *Id.* at 412. But Hogan's claim was primarily based on her mental health issues, unlike Stephens', which is primarily based on physical symptoms. *See id.* at 412. And, in contrast to the substantial record here, the evidence that Hogan submitted to the plan administrator consisted of "three brief visit notes from Hogan's treating physician—an internist lacking any sort of mental-health

specialization." *See id*. at 416. The Court thus does not find *Hogan* persuasive on the facts of this case.

Accordingly, references to Stephens' anxiety and stress do not undermine the other findings and conclusions of her treating physicians.

* * *

In sum, the Court finds that Prudential's final decision was not the result of a "deliberate, principled reasoning process supported by substantial evidence." *See Helfman*, 573 F.3d at 394. It was arbitrary and capricious for Prudential to find that Stephens was no longer disabled as of July 1, 2013 on the basis of evidence that had little, if any, relevance to that time.

## IV.

Remaining is the issue of the proper remedy: remand for further fact finding or award benefits. On this question the Court agrees with Defendants: Stephens is not necessarily entitled to a benefits award.

A court has "two options" after finding that a plan denied benefits arbitrarily and capriciously: "award benefits to the claimant or remand to the plan administrator." *Shaw v. AT & T Umbrella Ben. Plan No. 1*, — F.3d —, No. 14-2224, 2015 WL 4548232, at *11 (6th Cir. July 29, 2015). "[W]here the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Id.* (quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006)). *Compare Elliott*, 473 F.3d at 622 (holding remand was appropriate where it was not "clear[]" that plaintiff was entitled to benefits), *with Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009) ("[W]here 'there [was] no evidence in the record to support a termination or denial of benefits,' an award of

19

benefits is appropriate without remand to the plan administrator."). Still, "plan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits. They need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable." *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 609 (6th Cir. 2014).

On balance, the record is insufficient to establish that Stephens was "clearly entitled" to benefits for the entire period from July 1, 2013—when Prudential initially terminated her benefits—through Prudential's April 30, 2014 denial of her appeal. As discussed, Stephens' three treating physicians agreed that she was disabled at least through July 15, 2013. But after July 15, 2013, the record includes fewer examinations, and Stephens' disability status is murkier. For instance, Dr. Yang did not treat Stephens after April 16, 2013, when he extended her disability for three additional months. Dr. Patel last expressly opined on Stephens' disability status in June 2013. Granted, Dr. Al-Saghir made clear that throughout the entire relevant time he believed Stephens was disabled, but he hinged much of his final January 2014 determination on Stephens' hypertension. (AR at 282–83.) And just two weeks later, Dr. Brook found that Stephens' hypertension was well controlled and perhaps over-controlled. (AR at 48, 50.)

Thus, the record contains evidence that at some point prior to Prudential's April 30, 2014 denial letter, but after July 15, 2013, she may have been able to return to work. Where, as here, no dividing line is apparent from the record, it is for the plan administrator to draw it in the first instance. *See, e.g., Elliott*, 473 at 622–23 (remanding because "[w]e are not medical specialists and that judgment is not ours to make").

Accordingly, the Court will remand the matter to Prudential to provide a "full and fair review." *See Helfman v. GE Group Life Assur. Co.*, 573 F.3d at 396.[1]

**V.**

For the reasons stated, the Court finds that Prudential's April 30, 2014 denial of Stephens' benefits as of July 1, 2013 was arbitrary and capricious. Accordingly, the Court GRANTS IN PART Plaintiff's Motion for Judgment on the Administrative Record and DENIES Defendants' Motion for Judgment Affirming the Denial of Plaintiff's Request for Benefits.

The Court also REMANDS the case to the plan administrator for a full and fair review to determine Plaintiff's claim for benefits.

IT IS SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  August 18, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 18, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

---

[1] This ruling applies equally to Prudential's denial of STD and LTD benefits.  The record does not appear to contain any specifics on the LTD policy, other than Prudential's statement in its April 30, 2014 LTD denial letter that the elimination period is 365 days, which Kelly Services also noted in its January 22, 2014 letter. (AR at 183, 806.) Assuming that is correct, because Stephens was originally disabled as of her November 19, 2012 surgery, it is conceivable that based on the medical evidence and opinions contained in the records of Drs. Yang, Patel, and Al-Saghir, that Stephens was still disabled as of November 19, 2013, after the elimination period ended, making Stephens possibly eligible for LTD benefits for at least some period of time. Again, the exact timing is for Prudential to determine in a full and fair review on remand.